IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA | ) CR. NO. 04-0363 SOM |
| | ) |
| Plaintiff, | ) MEMORANDUM IN SUPPORT OF |
| | ) MOTION IN LIMINE TO PROHIBIT |
| vs. | ) INTRODUCTION OF TELEPHONE |
| | ) RECORDS AND RECORDINGS |
| SCOTT WILLIAM STADNISKY | ) |
| | ) |
| Defendant. | ) |
| ———————————————— | ) |

## MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO PROHIBIT INTRODUCTION OF TELEPHONE RECORDS AND RECORDINGS

### I.    Relevant Facts

Defendant Scott William Stadnisky is presently held without bail at the Federal Detention Center, Honolulu("FDC"). In order to use the telephone facilities at the FDC Defendant was required to complete a telephone log and to sign a waiver and consent form. Had he not acquiesced to the FDC's requests he would not have been allowed to use the telephone.

Defendant Scott William Stadnisky is charged in the instant case with conspiracy to distribute methamphetamine. The case in significant part is based upon the testimony of a cooperating defendant and telephone records belonging to an individual named George Banners. The government believes

5

that George Banners is in fact Defendant Stadnisky. The government seeks to introduce telephone records and recordings belonging to Defendant which were obtained by subpoena from the FDC. The records were obtained without the consent or permission of Defendant.

## II.    Argument Introduction

Defendant anticipates the government will attempt to portray the inmate telephone logs maintained by the FDC as mere business records which the government has a right to subpoena and use at trial. He also believes that the government will argue that the recording of inmate conversations by the FDC is appropriate as falling within the "consent" exception contained in Title III, 18 U.S.C. § 2511(2)(c), "where one of the parties to the conversation has given prior consent to such interception."

First Defendant would submit that the telephone records maintained by the FDC are not business records but are private records held in trust by the administration at the FDC.

Secondly, it is obvious that there was no explicit consent as that term has come to be understood in determining exceptions to the warrant

requirement. Therefore the telephone recordings obtained by the government were obtained in violation of the Constitution.[1]

### a)    The doctrine of consent

Consent is a "free and voluntary" agreement to a search or other intrusion, *Bumper v. North Carolina*, 391 U.S. 543, 548-49, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968), a "free and unconstrained choice" which is "free from any aspect of official coercion," *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041 (1973).

### i)    *Acquiescence is not consent*

Acquiescence to the apparent authority of the state is not consent.   In *Bumper* the Supreme Court held that consent could not be established "by showing no more than acquiescence to a claim of lawful authority."

If mere acquiescence to apparent authority were equated with consent it would be a simple thing for law enforcement officers to retrospectively justify any intrusion *after the fact*. If the original intrusion could be accomplished by guile or threat or show of authority, which could succeed without inciting physical resistance.  Physical resistance would remain, unfortunately, the only

---

1 Defendant assumes the government will suggest that the Defendant "*impliedly*" consented to recordings because he used prison telephones with awareness that the conversations were subject to monitoring. But, further, the government has done nothing to show that mere "implied consent" of an inmate bears on that particular branch of the consent doctrine which allows the seizure of conversations from third persons who misjudge the willingness of their telephonic correspondents to cooperate with law enforcement officers.

evidence of *lack of consent*.   In part, this is the reason why the burden on proving consent is described universally as a "heavy" one on the prosecution.

Of course the issue of consent is complicated in this case by the fact that Defendant is a prisoner, and had no say in complying with the policies of the FDC nor in whether the recording are being made. There is no way that he could register his lack of consent except by forgoing use of the telephone, a valued privilege. It would take a cynical mind indeed to say that a prisoner's acquiescence to use of monitored telephones was the product of a "free and unconstrained" choice, or any choice at all.

There also has to be consideration of exactly *what it was to which the Defendant may have acquiesced:* a *monitoring program* which, like similar regulatory schemes within the institution, would serve to enforce regulations concerning the use of the phone. As will be established at the hearing, in this matter there is a great difference between the monitoring of telephones for such regulatory purposes and the recording of specific conversations for their contents.  It is, perhaps, a distinction lost on those of us who have liberty, but in a prison where privacy is so dear, incremental gradations in the intrusions required make a world of difference.

**b)**    **"Consent" and electronic surveillance**

18 U.S.C. § 2511(2)(c), excuses obtaining a warrant "where one of the parties to the conversation has given prior consent to such interception." The statute makes no provision for anything other than explicit consent to the intrusion of electronic surveillance, and Congress obviously had in mind those cases where "explicit consent" had been obtained from one of the parties, such as *Lopez*, *Rathbun* and *On Lee*, and one-party consent to the recording of a two party conversation was upheld.    In each case there was a party to a conversation who was cooperating with the government and consented to the interception.

> We will see that the Senate Report suggested that

> Consent may be expressed or implied.  Surveillance devices in banks or apartment houses for institutional or personal protection would be impliedly consented to.

S.Rep. No. 1097, 90th Cong., 2d Sess., reprinted in  1968 U.S.Code Cong. & Admin.News 2112, 2182.  Obviously the Senate had in mind the type of situation its report described: where (1) there was only one "party" to the interception, and (2) where the interception was unequivocally in the interest of the party: security surveillance in apartments buildings, parking garages, and banks, etc.  This case raises the issue of whether, and under what set of facts, this concept in the legislative history support interpreting the statute to "imply"

consent to an unwilling prisoner who has no choice in the matter and the surveillance is not done for the inmate's protection?

### c)    Non-consenting parties to warrantless telephonic recordings

What about non-consenting participants to such telephone conversations?

The American federal[2] doctrine holds that parties to telephone conversations must bear the risk that those to whom they speak have decided to cooperate with the government and consented to government eavesdropping. *Rathbun v. Unites States*, 355 U.S. 107, 78 S.Ct. 161 (1957).  This doctrine really is rooted in a determination about the limits to the expectations of privacy that the Fourth Amendment will protect in the absence of a warrant. *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122 (1971).

Obviously, if the government establishes that a Defendant actually cooperated with the government and consented to recording of his conversations, the contents of those conversations may be used against *him*. But where the consent needs to be "implied," can that implied consent be

---

[2]    Relying on § 8 of the new (1982) Canada Charter of Rights and Freedoms, the Supreme Court of Canada has determined, finding more persuasive the reasoning of Justice Harlan's dissent in *United States v. White*, 401 U.S. 745, 786, 91 S.Ct. 1122 (1971) that one-party consent wiretaps are an invasion of the privacy rights of non-consenting parties to the conversation. *Duarte v. The Queen*, 74 C.R.3rd 281 (1990). Some states like Hawai'i have also disapproved of the one-party consent doctrine. *State v. Okubo*, 67 Haw. 197, 682 P.2d 79 (1984); Nevada Revised Statutes §§ 260.610-200.690; Cal. Pen. Code § 631.

enough, either under the statute or under the Fourth Amendment to defeat the reasonable expectations of privacy of third persons?

The notion of "implied consent" may not be equated with a kind of "forfeiture" of the right to refuse to consent or with circumstances in which the right to refuse to consent has been taken away. Moreover some courts, especially the Second Circuit, have never rendered a holding determining that anything less than the explicit consent of one party to a conversation could be sufficient to allow the recording of conversations for use against non-consenting parties.[3]

Therefore, the admission of intercepted conversations against the party who has not consented to the interception has nothing to do with their "consent," but with a determination that the Fourth Amendment simply does not entitled them to enforce their expectations that the persons to whom they speak will not cooperate with the state. But the indispensable ingredient to this analysis is the requirement that the first party has *actually consented to the recording.*

---

[3] An analogous situation would be in the area of correspondence: even if the state extracted a "consent" to the inspection of mail from a prisoner as a condition of having mailing "privileges" that "consent" would not be effective with respect to non-inmates. *United States v. Baumgarten,* 517 F.2d 1020 (1975)

### i)    *The doctrine one-party consent hinges upon the actual consent of one party to the conversation*

Obviously, if the government establishes that Defendant actually consented to recording of his conversations, the contents of those conversations may be used against them. But where the consent needs to be "implied," can that implied consent be imputed to third parties?

While the government may argue that the *prisoners* "impliedly" consented to the recordings because they were on notice that the telephones could be monitored, it ignores the fact that anything other than express consent of the first party to the interception destroys the rationale on which such interception was allowed to begin with.

In fact there is no case which has held or which justifies the use a finding of anything less than explicit consent of one party as a predicate to the admission against another party to a conversation of its recorded contents.

### d)    **Here there was no consent, and therefore no "implied consent"**

In this case there is no evidence to demonstrate that the accused actually consented to the recording of telephone conversations or for that matter the release of telephone lists or logs. Instead Defendant assumes the argument to be made is that the inmates were given "notice" that the phones

were capable of being monitored and therefore that it was possible for conversations to be recorded.4

The argument from this type of notice to some type of "consent" is, primarily, illogical. If the government "notified" us, by publication in the Federal Register, that our homes would be subject to search for no reason, this would hardly establish that searches conducted under such a policy were "consensual." Not only would the mere acquiescence of a citizen to such an intrusion, by definition, not be consent, as *Schneckloth* teaches, because there would have been no "free and unconstrained choice" in the matter.

The concept that mere "notice" is relevant at all is one stolen from the area of administrative searches, where the existence, and publication of regulations is relevant to the propriety of warrantless administrative intrusions. As Professor LaFave observes,

> While it may be true that advance notice of the inspection of mail is a factor to be taken into account in determining the reasonableness of such an inspection scheme, it can hardly be said that the notice puts to rest any Fourth Amendment issue. Were that a fair interpretation of *Katz*, then Fourth Amendment protection would vanish quickly as the

---

4 Amy Standefer, Esq. counsel for the FDC-Honolulu informs counsel that the notice given inmates regarding tapping of conversations are poted next to telephones and are included in the inmate handbooks. She indicates that there are no explicit notices of the intended use of the recordings. Further she indicates that when the FDC supplies records pursuant to subpoena all telephone numbers of 3rd parties called are to re redacted.

government put the public on notice as to the various types of intrusions it was prepared to undertake.

LaFave, Search and Seizure § 10.9(c) p.116. " . . . *Katz* surely does not mean that Fourth Amendment protection evaporates upon advance notice of any intended surveillance." LaFave, at § 10.9(d) p 124.s

The inapplicability of the "administrative search" exception will be addressed below.

As we will show, the facts proven are better suited to the argument that it is necessary to the regulation of the prison environment to monitor inmate telephone calls for the purpose of maintaining order and the security of the institution, and to enforce valid regulations of telephone use. The first problem is that the government will not be able to make that argument.

The second is that whereas regulations allowing greater intrusion than monitoring, for example the reading of correspondence as opposed to its mere inspection, have been found to be constitutionally required, the FDC has done nothing to promulgate any directives or guidelines to say when and how there might be any actual *recording* of an inmates' conversations. Moreover regulations and directives as to when and under what circumstances information on an inmate such as telephone logs will be released to third parties.

14

**e)    The one-party consent doctrine is no different for prisoners**

As far as the doctrine of *Rathbun* and *White* and the express provisions of Title III, it can make no difference.  See  *United States v. Amen*, 831 F.2d 373 (2nd Cir. 1987).

A person at liberty or a prisoner is each capable of giving consent to interception of a conversation, and the others will be deemed to have assumed that risk.

**i)    *Inmates have rights to privacy***

There are privacy rights for prisoners, especially when communicating with the outside world. *Procunier v. Martinez*, 416 U.S. 396 (1973).  In such case the regulatory posture of the prison does not just affect inmates.

> Whatever the status of the prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech . . . .
>
> Accordingly, we reject any attempt to justify censorship of inmate correspondence merely by reference to certain assumptions about the legal status of prisoners.

416 U.S. at 408-09. In *Procunier* the Supreme Court held that any regulation adopted must further a substantial governmental interest in the security or order of the institution or the rehabilitation of prisoners. Moreover, any regulation must be no more restrictive than necessary to the protection of the particular interest involved. 416 U.S. at 413.  The Court also agreed that

the decision to intrude in the correspondence of the inmate "must be accompanied by minimum procedural safeguards" which protect from "arbitrary governmental intrusions." 416 U.S. at 417-18. Concurring, Justice Marshall and Brennan observed that correspondence with those outside the prison was not merely a privilege, but a constitutionally guaranteed right.[5] They made it clear that at issue in the case was not the *censorship* of mail, but the mere *reading* of the mail of inmates.

> It seems clear that this freedom may be seriously infringed by permitting correctional authorities to read all prisoner correspondence.
> 416 U.S. at 423.

Various directives of the New York Department of Correctional Services (DOCS) have been promulgated subsequent to *Procunier* under the pressure of inmate civil rights litigation relating to inmate correspondence, access to literature and visitation. Although each of these can be regulated to a substantial degree, the inmate retains rights, as do members of the at-large community who wish to correspond and visit with inmates.

The very absence of any regulations governing the monitoring of inmate calls or the recording of particular inmates' conversations for regulatory purposes, should invalidate the monitoring program generally. This goes as well for release of inmate records to 3rd parties. Here it is sufficient to show

---

[5] See *Sostre v. McGinness* 442 F.2d 178, 199 (2nd Cir. 1971) (*en banc*).

that the determination here cannot be made "by reference to certain assumptions about the legal status of prisoners" but rather the general problem of restrictions on fundamental liberties "imposed in furtherance of legitimate governmental activities." 416 U.S. at 409.

**f)    The Notice to Inmates does not give rise to consent**

*i)    The notice was not designed to elicit consent*

In the present case the "notice" provided to FDC inmates was not, at best, done consistently or with any indication of a real desire or effort to impress inmates not only that their telephone calls might be monitored, in order to enforce the rules, but also that their conversations might be recorded for possible use in criminal investigations without a warrant or even superintendent authorization.

*ii)    The "notice" was for <u>monitoring</u> for regulatory purposes, if anything, and not for criminal investigations*

If "notice" by the FDC that it was going to engage in certain activities could ever honestly provide the excuse to "deem" the citizen to have "consented" to the government intrusion, surely the consent could not be extended to more intrusive government conduct than that contained in the notice. Here the notice provided to the inmates alerted the inmates only to the *capability* of *monitoring* telephone conversations.    There was no notice, and

17

therefore there could be no consent, to the *recording of particular conversations for further court use*, especially for purposes other than the enforcement of the regulations relating to telephone use. If *"notice"* is the government's basis for arguing anything, then the government can hardly extend the authority of the prison beyond what was contained in the notice. *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 582 (11th Cir. 1983). The Second Circuit, in *United States v. Willoughby*, 860 F. 2d 15 (2nd Cir. 1988) refused to extend the government's authority to record beyond that set forth in the notice. The notice advised inmates that their telephone calls were being recorded. In *Willoughby* two inmates conversed while standing next to the telephone. As one of the inmates held the receiver of the telephone in his hand, their conversation was accidentally recorded. The Government argued that the inmates had consented to the recording by virtue of the notice. The notice made no mention of recording any conversations other than those carried over the telephone lines. The Court, refusing to adopt the Government's argument, stated:

> [W]e are skeptical of the government's contention that Quintin's consent to the interception of his telephone calls also constituted consent to the interception of his in-person conversation with Montgomery.
> *Willoughby, supra* at 22.

One can hardly agree, in principle, that a citizen can be deemed to "consent" to unwarranted government intrusion merely by providing "notice" that engaging in what would otherwise be a protected right or privilege

18

constitutes such "consent." Why couldn't residence or travel into a particular municipality be made an indication of "consent" to unannounced police entry?

Numerous Courts have decided when notice of monitoring and recording evolves into consent on the part of inmates. The Eighth Circuit, in *United States v. Horr*, 963 F.2d 1124 (1992) addressed this issue and found the inmate had impliedly consented, based upon information he received (an orientation handbook, verbally at an orientation meeting and notice posted near the telephone), concerning the telephones being monitored and recorded. Importantly, the sign posted near the telephones made specific reference to use of the phones constituting consent. In *United States v. Noriega*, 764 F.2d 1480 (S.D.Fla. 1991) the notice included a sign posted near the telephone which advised the user that use of the telephone "constituted consent to monitoring". Supra at 1491. In *United States v. Willoughby*, 860 F.2d 15 (2nd Cir. 1988), the court stated that notices, prominently posted, advised the inmates that their "use of institutional telephones constitutes <u>consent</u> to the monitoring within the meaning of Title III. Supra at 20 (emphasis added).

**G.    This was not a permitted administrative seizure**

The cases cited above, to a limited extent, the question of "notice" to the inmates, have reference, if to anything, to the power, and the limits upon the power, of prison officials to intrude into the written and oral communications

19

between prisoners and others without a warrant, in order to enforce prison regulations.

This case has more to do with *administrative searches*, and the administrative search as an exception to the warrant (and Title III) requirement.

## 1.    The administrative search: general principles

Merely labeling a search or inspection "administrative" or "regulatory" does not obviate the requirement for a warrant.  *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727 (1967) In *Camara*, although a warrant was required for inspection of inside of homes for code violations, the warrant need not have been based on the particularity required for a criminal warrant.   This is because area searches for code compliance are "neither personal in nature nor aimed at the discovery of evidence of crime, they involve a relatively limited invasion of he urban citizen's privacy."  See also *Marshall v. Barlow's Inc.*, 436 U.S. 307, 98 S.Ct. 1816 (1978).  In some cases, the regularity of administration of a warrantless inspection program may provide a constitutionally adequate substitute for a warrant, especially where the enforcement needs may be jeopardized by a warrant requirement. *Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534 (1981) (Inspections under the Mine Safety and Health Act).

General requirements for a valid administrative search, require that the activity be "closely regulated" and this usually had to do with businesses of one type or another.  To be valid, even in an area which is "pervasively regulated," the regulations will be deemed reasonable only where certain requirements are met.

First, "there must be a substantial governmental interest;  second,  the warrantless inspections must be necessary to further the regulatory scheme; third, the statute or regulation must ensure that the inspection program "in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant."  *New York v. Burger*, 482 U.S. 691, 702, 96 L.Ed.2d  601, 614, 107 S.Ct. 2636 (1987).  The Supreme Court stated:

> In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers.  *Marshall v. Barlow's* [cite omitted].   To perform this first function, the statute must be "sufficiently comprehensive and defined that the owner of the commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Donovan v. Dewey*, 452 U.S., at 600,  69 L.Ed.2d 262, 101 S.Ct. 2534.  In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be "carefully limited in time, place, and scope." *United States v. Biswell*, 406 U.S., at 315, 32 L.Ed.2d 87, 92 S.Ct. 1593.

*New York v. Burger*, 482 U.S. at 703.  See also,  *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254 (1987);  *S & S Pawn Shop v. City of Del City*, 947

F.2d 432 (10th Cir. 1991);   *V-1 Oil Co. v. State of Wyoming*, 902 F.2d 1482, 1487 (10th Cir. 1990).

Of course it is a key element of a permissible administrative search or regulatory inspection that it be civil in nature, and directly related to the regulations to be enforced and not a pretext for a criminal investigation. *New York v. Burger, supra*, 482 U.S. at 713, 107 S.Ct. at 2647; *Turner v. Safley*, 482 U.S. at 89;   *Michigan v. Clifford*, 464 U.S. 287, 104 U.S. 641 (1984).   (Fire investigations), *Michigan v. Tyler*, 436 U.S. 499, 56 L.Ed. 486, 98 S.Ct. 1942 (1978);   *Donovan v. Dewey*, 452 U.S. 594, 69 L.Ed.2d 262, 101 S.Ct. 2534 (1981);   *Klarfeld v. United States*, 944 F.2d 583 (9th Cir. 1991); *United States v. $124, 570 U.S. Currency*, 873 F.2d 1240, 1243 (9th Cir. 1989);   *United States v. Davis*, 482 F.2d 893, 908 (9th Cir. 1973); *Nat. Federation of Fed. Employees v. Weinberger*, 818 F.2d 935, 943 and n.12 (1987) (OSHA) [6]

*Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254 (1987) is generally regarded has having restricted the scope of *Procunier v. Martinez'* standard of "no greater than necessary or essential" to protect an "important or substantial interest" to a "reasonably necessary" standard.   However, the *Procunier* standard still applies with respect to restrictions in outgoing correspondence, *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874 (1989), the correspondence

---

[6] Other cases are collected in *New York v. Burger*, 482 U.S. at 724, 96 L.Ed.2d at 627-28.

category most closely resembling the telephone situation.  See also *Martucci v. Johnson*, 944 F.2d 291, 295-96 (6th Cir. 1991).

It is also sometimes relevant that the regulated community is given notice of the regulations permitting such intrusions.  Hence the relevance of the "cannot help but be aware" concept in *Burger.*

Our analysis of the application of this doctrine might well begin with some other areas where there is analogous governmental interest in regulatory inspections.

### 2.    *Vehicle "road blocks"*

Warrantless administrative intrusions are also similarly considered in areas not relating to the conduct of business, like the use of "roadblocks" in enforcing motor vehicle regulations.  Accepting the operation of motor vehicles as a regulated activity, courts have found that road block inspections can be tolerated if the intrusion is minimal and it applies equally to all, with a regulatory program that insures against arbitrary or subjective targeting of a particular person or group.  For example, the minimally intrusive, and discretion-free road blocks or random stops suggested by the Supreme Court in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391 (1979).  The lawfulness of such intrusions depends not on being labeled "roadblock" or "checkpoint", but conformity of the action with regulations designed to insure that the initial stop

is not a matter of police discretion and that the extent of the intrusion will be very limited — consistent with the groundless nature of the intrusion.

In *Michigan State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481 (1990), the Supreme Court held that DWI checkpoint stops, although seizures within the scope of the Fourth Amendment, may be "reasonable" and not violate the Fourth Amendment.   Similarly, the New York Court of Appeals in *People v. Scott*, 63 N.Y.2d 518, 483 N.Y.S.2d 649 (1984) ruled that the use of DWI roadblocks by law enforcement may be constitutionally permissible.

Both courts arrived at this conclusion by reasoning that the intrusion, being less than a seizure requiring probable cause, and less than a stop requiring reasonable, articulable grounds to suspect criminal activity, is so minimal that it can be effectuated without any individualized suspicion. *See Sitz*, 110 S.Ct. at 2487-88; *Scott*, 63 N.Y.2d at 525, 483 N.Y.S.2d at 651; *See also United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074 (1976) (held that stop at border patrol checkpoints which was brief and minimally intrusive, was reasonable under the Fourth Amendment).

The determination of reasonableness turns on several crucial elements involved in the operation of the roadblocks.   First, the DWI checkpoints were conducted pursuant to explicit regulations which circumscribed the discretion of the officers in selecting the location of the roadblock.   Second, the regulations required that vehicles be stopped according to wholly uniform and

24

neutral criteria, such as the stopping of every car or every fourth car. Third, the initial observation and questioning were brief and limited to inquires regarding the driver's license, vehicle registration, insurance and proof of inspection. *See Sitz*, 110 S.Ct. at 2486-87; *Scott*, 63 N.Y.2d at 526-27, 438 N.Y.S.2d at 652-53.

These guidelines insure that totally objective and neutral criteria, not the decision of a police officer, will determine who gets stopped and that the intrusion on the motorist remains minimal.

### 3.    *Drug testing*

The government has a great interest in having rail employees free of the influence of alcohol and drugs. In upholding the urine testing regulations of the Federal Railroad Administration in *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 103 L.Ed.2d 639, 109 S.Ct. 1402 (1989), the Supreme Court again reiterated the importance of the requirement in *Burger* that regulations allowing for warrantless intrusions must make the intrusion minimal as possible, and remove discretion from the investigating officer. 489 U.S. at 623, 625, 103 L.Ed.2d at 663, 665.

This analyses closely follows the analysis called for in the regulation of inmate mail, voice correspondence and telephone logs. The intrusion of monitoring will be tolerated so long as it is "minimal", like opening mail to

check for contraband, and regulated to insure against arbitrary targeting of particular inmates for closer scrutiny and for purposes of a warrantless criminal investigation. If there is to be more focused monitoring for enforcement of the prison rules, there ought to be regulations setting standards for such. If the monitoring is to be escalated into a criminal investigation, it requires that a judicial warrant be obtained.

### H.    The regulation of prisoners

It is obvious that prisons need to adopt and enforce very special rules to preserve the  safety and order of the facility and its inhabitants, as well as protect the interests of others outside the facility. Professor LaFave makes the observation that some criminal procedure decisions have mad the "facile assumption that prisoners are without Fourth Amendment rights" which "does not square with significant developments in the general area of prisoners' rights. Lafave, Search and Seizure, § 10.9.

> [T]hough [the prisoner's] rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protection when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country.
>
> *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Numerous other cases are representative of this trend in establishing privacy rights of prisoners[7] or the limits on the powers of prison officials for, although there are some rights to liberty and privacy that are lost to prisoners, there are other, especially First Amendment freedoms that remain protected. Not only does the inmate retain much of his or her right to express ideas and communicate with others, the rights of others are not, at least outside the facility, subject to regulation.

### i)    *Correspondence*

The holding in *Procunier* squarely places the regulation of prisons within the "administrative search" doctrine for "closely regulated" operations.    The requirement in that case of compelling governmental interest consistent with the administrative mission of the governmental unit, and the requirement of regulations which provide procedural protection against arbitrary enforcement is entirely consistent with the treatment by the federal courts of administrative intrusions generally.    Minor intrusions for a regulatory purpose will be tolerated on less than would be required to commence a criminal investigation, so long as the regulations are not enforced arbitrarily or as a pretext to further some other governmental interest.

---

[7]  See cases collected at LaFave, *supra*, § 10.9  p. 103  n.6.

27

Minimality, in terms of correspondence, constitutes the inspection of envelopes for the presence of contraband or "third party correspondence" -- the enclosure in one letter from a permitted correspondent of a communication from another -- and the contents, only to determine generally that crimes and escapes were not being plotted.

To this end, there are distinctions drawn in the prison setting between degrees of intrusion into the privacy or communications of a prisoner in which we would not see much of a difference here in the "outside." A good example is the permission for the institution to give cursory or superficial examination of correspondence for contraband, planning for a criminal enterprise or escape, or third party mail, *without reading* the contents of the mail. The distinction would seem artificial to us on the outside, and we would not trust that the state could open our mail without actually reading it.

The distinction is relied upon in the prison setting and the good order of the institution depends on continuing faith that it is being followed.     The area of inmate correspondence is closely parallel to that of inmate telephone calls.  The regulations draw the distinction between *opening* mail and *reading* mail.

In this case, the distinction between "monitoring," which provides the ability for the corrections officers to ensure that inmates are adhering to regulations pertaining to inmate telephone calls, and the listening to and

28

recording of telephone calls for other purposes, is the same as the distinction between "opening" or inspecting mail and *reading* mail.

### ii)    *Visitation and the relevance of "notice"*

Despite the concerns for introduction of contraband, and even the pervasive presence of controlled substances, the most likely or frequent source surely being visitors, prisons are not free to act as though visitors, and inmates who have had contact with prisoners, are without privacy rights. *Blackburn v. Snow*, 771 F.2d 556 (1st Cir.1985); *Thorne v. Jones*, 765 F.2d 1270 (5th Cir. 1985). (Regulations allowing strip searches of all visitors were abhorrent to the Fourth Amendment.)

It is in the area of prison visitors that we see judicial interest in the existence of signs notifying the visitors of the regulations concerning searches and inspections. *People v. Thompson,* 185 Colo. 208, 523 P.2d 128 (1974); *State v. Custodio*, 62 Hawaii 1, 607 P.2d 1048 (1980); *People v. Turnbeaugh, supra.*

It is also significant in the eyes of some courts, that visitors are adequately warned at the point of entry that they are liable to search if they continue into the institution.  Such notice is important, but not because, as often asserted, it establishes the visitor's "implied consent" to whatever search is thereafter conducted or that it establishes that the "privilege" of entry was conditioned upon the surrender of Fourth Amendment rights.  Rather, the notice is  important simply because it bears upon the reasonableness of the selection process.

LaFave, Search and Seizure, § 10.7(b) (p. 45). (footnotes omitted) Professor LaFave concludes flatly that "notice" cannot be equated with "consent" or "implied consent":

> On the nonutility of the implied consent notion in working out problems of this kind, see § 8.2(*l*); and consider *Blackburn v. Snow*, 771 F.2d 556 (1st Cir. 1985) (holding "submission to the searches * * * cannot properly constitute consent because their access to the Jail was impermissibly conditioned on that submission.")

LaFave, *supra*, p. 45 n.38. Professor LaFave goes on to make the additional relevant point that to the extent that any "notice" is given weight, it should not be read any broader than its own literal language.

> Even assuming that the consent notion has some validity, a sign declaring "you consent to a search of your person and property" does not cover strip (as opposed to routine) searches of visitors. *Thorne v. Jones*, 765 F. 2d 1270 (5th Cir.1985).

*Id.* In the present case the "notices" were with respect to *monitoring* rather than to *notice of eventual use*.

### iii)    Cell searches: different treatment

The one major distinction in the area of prison searches is the toleration of randomness, and the diminished expectation of privacy in physical spaces (as opposed to correspondence, writings, visitation and telephone conversation contents). *Hudson v. Palmer*, 468 U.S. 517 (1984).

### iv)    *Telephones*

Several courts have assumed that some level of access to telephones must be accorded to prisoners. *Divers v. Department of Corrections*, 921 F.2d 191, 193-94 (8th Cir. 1990); *Benzel v. Grammer*, 869 F.2d 1105, 1108 (8th Cir. 1989); *Williams v. McClain*, 708 F.Supp. 1086, 1088 (W.D.Mo. 1989); *Wooden v. Norris*, 637 F.Supp. 543, 555-56 (M.D.Tenn.1986). Of course that issue is not presented here, since, once the telephone system is provided, the interference with the privacy of telephone conversations is obviously of constitutional dimensions.

There can be no doubt that prisons can properly overhear inmate conversations in a superficial manner sufficiently only to determine that the prison regulations are being followed. If in the course of that monitoring a violation of the rules is seen "in plain view" then there can be little doubt about the right of the officials to use what they have overheard in both enforcing the security of the prison, and as evidence against the accused. *United States v. Paul,* 614 F.2d 115 (6th Cir. 1980). In that case the scheme of the defendants was intercepted in the course of routine monitoring of phone calls and the further investigation of the information was directly aimed at the prevention of the introduction of contraband into the prison. Accordingly the conversations were deemed to have been obtained in the "ordinary course of . . . duties" of

the corrections officials, an exception to Title III's warrant requirement. 18 U.S.C. § 2510(5)(a).

## III.    Conclusion

Defendant would respectfully submit that based upon the authorities cited herein this Honorable Court should prohibit the introduction of any tape recording and or record of telephone conversation as evidence in the trial of this matter.

Dated:  Honolulu, Hawaii, January 23, 2006.

Law Offices Of:
HARRISON & MATSUOKA

_____

WILLIAM A. HARRISON
Counsel for Defendant
SCOTT WILLIAM STADNISKY

UNITED STATES OF AMERICA v. SCOTT WILLIAM STADNISKY; CR. NO. 04-0336SOM; **Notice of Motion to Prohibit Introduction of Telephone Records**